[Cite as *In re S.C.*, 2014-Ohio-5116.]

STATE OF OHIO ) IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

IN RE: S.C.

C.A. No. 27406

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 13-01-0049

DECISION AND JOURNAL ENTRY

Dated: November 19, 2014

HENSAL, Presiding Judge.

{¶1} Appellant, Misty C. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed one of her minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Although Mother has four minor children, only one of them is at issue in this appeal: S.C., born April 15, 2009. The child's father did not participate in the trial court proceedings and is not a party to this appeal.

{¶3} S.C. was diagnosed with severe kidney disease when she was ten months old. She began receiving outpatient care through the nephrology clinic at Akron Children's Hospital. Over time, however, S.C.'s medical condition declined and she became seriously underweight. During February 2012, a hospital social worker made a referral to CSB, alleging that Mother had

failed to assure that S.C. consistently attended medical appointments and received the care that she needed at home. CSB and Mother agreed to a voluntary case plan, with a primary focus on Mother meeting S.C.'s medical needs.

{¶4} Approximately four months later, S.C. was diagnosed with renal failure and began requiring dialysis on a daily basis. Mother was trained to administer the dialysis at home each evening. CSB later arranged for Mother to receive some in-home services to assist her with S.C.'s medical care. Throughout this time, Mother had in her sole care S.C. and her other three children. Although Mother's oldest child eventually went to live with his father, Mother continued to care for her younger two children, an infant and a toddler, without the assistance of another adult living in the home.

{¶5} After S.C. began receiving dialysis at home, she required three separate hospitalizations because she developed infections. The details about the first two infections are not set forth in the record but apparently resulted from the catheter malfunctioning during dialysis. The third infection had resulted from a broken catheter. Although the catheter breakage would have been apparent from urine leaking on and around S.C. and because the recording device on the urinalysis machine showed that no urine was passing through the machine, Mother did not take S.C. to the hospital for an entire week. During that time, S.C. received no daily dialysis and an infection developed and worsened.

{¶6} Because this was S.C.'s third infection, which was so severe that it was life threatening, S.C.'s nephrologist was concerned about S.C. being returned to Mother's home. Consequently, CSB filed this involuntary case and S.C. was placed in its emergency custody before she was released from the hospital. S.C. was later adjudicated a neglected and dependent child and placed in the temporary custody of CSB.

{¶7}    During the pendency of this case, the case plan focused on several problems, including Mother's lack of stable income and housing and her use of marijuana.  There were also concerns throughout this case about whether S.C.'s medical providers were adequately addressing her need to receive a kidney transplant.  CSB's primary concern, however, continued to be Mother's ability to consistently meet S.C.'s serious medical needs on a daily basis.

{¶8}    CSB worked with Mother for over two years to assist her with meeting S.C.'s medical needs.  During this time, Mother failed to attend visits and medical appointments with S.C. on a regular basis.  On October 25, 2013, CSB moved for permanent custody of S.C.  Mother alternatively moved for a six-month extension of temporary custody.  Following a hearing on both motions, the trial court terminated parental rights and placed S.C. in the permanent custody of CSB.  Mother appeals and raises two assignments of error.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT GRANTED [CSB'S] MOTION TO PLACE S.C. IN THE PERMANENT CUSTODY OF THE AGENCY AND DENIED MOTHER'S MOTION FOR A SIX-MONTH EXTENSION WHEN THE CHILD COULD BE PLACED WITH MOTHER WITHIN A REASONABLE PERIOD OF TIME.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF S.C. TO [CSB] AS IT WAS AGAINST S.C'S BEST INTEREST AS A LEGALLY SECURE PLACEMENT CAN BE GRANTED WITHOUT GRANTING PERMANENT CUSTODY TO [CSB].

{¶9}    Through her two assignments of error, Mother argues that the evidence failed to support the trial court's permanent custody decision.  She asserts that the evidence instead supported her motion for a six-month extension of permanent custody to enable her to complete the reunification goals of the case plan.

{¶10} Revised Code Section 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public children services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in Revised Code Section 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶11} The trial court found that the first prong of the permanent custody test had been satisfied because S.C. could not be returned to Mother within a reasonable time or should not be returned to her based, in part, on its factual finding under Revised Code Section 2151.414(E)(1), that Mother had failed to substantially remedy the conditions that caused S.C. to be placed outside her home.[1] Mother disputes that finding and argues that the evidence demonstrated that she had substantially complied with the requirements of the case plan and that an extension of temporary custody was in S.C.'s best interest.

{¶12} The trial court's finding that Mother had not substantially remedied the conditions that caused S.C.'s ongoing removal from the home was relevant to both of these dispositional alternatives because the trial court had authority to extend temporary custody only if it found that Mother had made "significant progress" on the case plan, that an extension was in the best interest of S.C., and that there was reasonable cause to believe that S.C. would be reunified with Mother or otherwise permanently placed during the extension period. R.C. 2151.415(D)(1). We

---

[1] Although the trial court made an alternate finding that Revised Code Section 2151.414(E)(4) was satisfied because Mother had demonstrated a lack of commitment to S.C., this Court confines its review to the trial court's finding under Section 2151.414(E)(1).

agree with the trial court that CSB demonstrated by clear and convincing evidence that Mother had failed to substantially remedy the conditions that caused S.C. to be placed outside the home and that permanent custody was in her best interest.

**Case Plan Compliance**

{¶13} In addition to Mother obtaining stable income and housing, the primary reunification goal of the case plan was for Mother to consistently visit S.C. and attend all of her medical appointments so that she would stay informed about how to meet S.C.'s medical needs. The evidence was not disputed that Mother failed to make adequate progress toward that goal. Several witnesses testified that, of S.C.'s sixteen medical appointments during this case, Mother attended only four. As will be explained in more detail below, Mother also failed to visit S.C. on a consistent basis.

{¶14} Throughout this case, Mother has offered several reasons for her failure to regularly attend S.C.'s medical appointments and visits, such as her lack of transportation and the fact that she had two small children at home, who were not permitted to attend the medical appointments. Despite CSB's efforts to help her overcome those obstacles, such as providing her help with transportation, Mother still did not attend visits or appointments regularly. In the end, CSB and the guardian ad litem questioned Mother's dedication to meeting S.C.'s serious medical needs.

{¶15} Both the caseworker and the guardian ad litem expressed concern that, rather than working to be reunified with S.C., Mother always had excuses for her failure to do so. The guardian ad litem explained that, although she had continually looked for an attitude that Mother was willing to "fight" to keep her child, she never saw a "true effort" by Mother to be reunified

with S.C. Several other witnesses testified that, although they believed that Mother loved S.C., she had not made much effort to learn how to meet S.C.'s medical needs.

{¶16} This Court's review of the record reveals that the trial court had clear and convincing evidence before it to demonstrate that Mother had failed to substantially remedy the conditions that caused S.C. to be placed outside her home. *See* R.C. 2151.414(E)(1). Consequently, the trial court also reasonably concluded that Mother had failed to make significant case plan progress that could have justified a six-month extension of temporary custody. *See* R.C. 2151.415(D)(1).

**Best Interest**

{¶17} CSB also presented clear and convincing evidence to establish that permanent custody was in S.C.'s best interest. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in Revised Code Section 2151.414(D): the interaction and interrelationships of the child, her wishes, the custodial history of the child, and her need for permanence in her life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶18} Mother's interaction with S.C. during this case was extremely limited. No one disputed that she loved S.C. and that they interacted well together. Several witnesses testified that, when Mother visited S.C. or attended her medical appointments, they observed a loving bond between the two. Mother's interaction with S.C. did not progress beyond supervised or

monitored visits, however, because she never demonstrated the ability to meet S.C.'s medical needs without assistance. Although visits were initially scheduled twice a week for two hours, CSB complied with Mother's request that visitation be switched to once a week for four hours.

{¶19} More significantly, Mother's rate of attendance at the weekly or biweekly visits was poor. Despite her testimony that she loved and was dedicated to S.C., she attended only 15 of the 63 visits that were scheduled during this case, which was an overall attendance rate of less than 25 percent.

{¶20} As with her failure to attend S.C.'s medical appointments, Mother offered several reasons for her failure to attend visits, such as her lack of transportation or a phone. Testimony about her lacking a phone was that she had allowed a friend to borrow her phone, even though she had two young children at home and needed to communicate with CSB and S.C.

{¶21} Moreover, unlike S.C.'s medical appointments, Mother was permitted to bring the younger siblings to the visits, yet she still failed to attend regularly. In fact, Mother's case at the permanent custody hearing focused on her testimony that all of her children were closely bonded and that the sibling bond should not be severed. Despite her apparent awareness that her children were bonded, however, she had failed to foster that bond during this case by facilitating regular visitation between the siblings.

{¶22} S.C.'s wishes were not directly expressed at the hearing. Several witnesses explained that S.C. loved Mother but that she had been hurt and disappointed by Mother's failure to consistently visit her. At the beginning of this case, S.C. would cry when each visit with Mother ended. By the end, however, S.C. showed little emotion when the visits started or ended.

{¶23} The guardian ad litem opined that permanent custody was in S.C.'s best interest as the only means of her having a chance at a healthy life. As S.C.'s doctor had testified, her

kidney disease is a life-long illness and will probably require multiple kidney transplants. The guardian emphasized that it was crucial for S.C. to become medically stable, receive a kidney transplant, and receive appropriate medical follow-up care for the rest of her life. She did not believe that Mother was willing or able to meet S.C.'s medical needs on a consistent basis.

{¶24} S.C.'s custodial history included the first three years of her life in Mother's custody. After S.C. was diagnosed with kidney disease, Mother failed to adequately meet her medical needs. When S.C. came into CSB custody, she was underweight, had not been receiving her medications or dialysis as required, and she had been hospitalized three times for serious infections.

{¶25} During the pendency of this case, while S.C. was in the custody of CSB, she has been living with the same foster parents. The foster parents are interested in adopting her and providing her with a permanent home. She had been attending all of her medical appointments and was receiving consistent and appropriate medical care in the foster home. S.C. had not developed any infections during that time. Although she was still in need of a kidney transplant, S.C.'s condition had stabilized. Her doctor explained that her daily dialysis would serve as a "bridge" until she could receive a transplant. The hospital social worker testified that he had seen a "dramatic improvement" in S.C.'s physical appearance while she was in foster care.

{¶26} S.C. was in need of a legally secure permanent placement, particularly because she needed a kidney transplant. Her nephrologist explained that S.C. would not be placed on the kidney transplant list until she was living in a stable home because of the extensive post-transplant medical care that would be crucial to her survival. By her own admission, Mother was unable to provide S.C. with a stable permanent home at the time of the hearing. Because CSB had been unable to find a suitable relative who was willing and able to do so, the trial court

reasonably concluded that the only dispositional option for S.C. at that time was permanent custody so that she could be placed for adoption.

**{¶27}** Consequently, the trial court had substantial evidence before it to support its conclusion that S.C. could not or should not be returned to Mother's custody and that permanent custody was in her best interest. Mother's assignments of error are overruled.

## III.

**{¶28}** Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, J.
WHITMORE, J.
CONCUR.


APPEARANCES:

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

MARY DAMICONE, Attorney at Law, for Appellee.

LINDA BENNETT, Attorney at Law, for Appellee